WIGGOUGHBY, J.
The two leading questions presented for our decision are:
Rirst. Ought.the case, under the circumstance thereof, to have been removed on the petitions, or either of them, for such removal to the United States Circuit court?
Second. Was the sale made by the trustee, Joseph B. Stewart, valid; and did it operate to extinguish the Alexandria and Washington Railroad Company, and divest it of its corporate rights and privileges?
It would seem to me, without reference to the validity or invalidity of such sale, and without now passing upon the question of its right to be regarded as a corporation, consistent with legal principles to regard for the purposes of the decision of the points before us, the Washington, Alexandria and Georgetown Railroad Company as a company capable of being sued, and of exercising certain powers.
This company certainly insists on being so regarded; it has acted as such with a full board of officers and directors; and as such, has issued stock, bonds and notes to a very large amount; it has been so recognized by *the public; and transactions of great extent have taken place upon the faith of the existence of such company, and it was recognized as such by the act of assembly of January 23, 1864, by which large powers and privileges were granted to it “as a lawfully existing company. ”
The question regarding the petitions for removal seems to me to require our first consideration.
I will designate the two companies as the old and the new companies.
The bill, as at first presented, was brought by the old company against the new company, Hay, Stewart, Benjamin and Joseph Thornton, Davison, and the persons interested in the several deeds of trust.
Hay, in his answer, expressly waives all right to remove such cause as to himself, and Joseph Thornton and Davison protested against such removal.
The first petition was made by the new company. That this was properly overruled, it seems to me, there can be no question. The old and the new companies were both residents and citizens of the State of Virginia; and I think it is equally plain that Stewart alone, under the law as it then existed, could not properly ask for a removal of such cause.
It has been settled that a suit could not be removed when a part of the plaintiffs or defendants are citizens of the State where the suit is brought, and a part of some other State (Wilson v. Blodget, 4 McLean’s R. 363; Northern Indiana Railroad Company, 3 Blatchf. R. 82), and in order to remove such cause to the United States court, all the defendants must join in the petition for such removal. (See 2 Sumner 339.) '
The motion to remove in December 1866 was also properly overruled.
The provision of the act of congress of July 1866, upon which the petitioner then relied, provided for a removal, in cases of citizenship of different States, on *the petition of a defendant, “if the suit is one in which there can be a final determination of the controversy, so far as it concerns him, without the presence of the other defendants as parties to the cause.” That this was not such a case is perfectly manifest from the slightest inspection of the pleadings and proceedings. Congress passed an act March 2, 1867, providing that where there was a controversy between citizens of different States, either party, plaintiff or defendant, might, on filing an affidavit in the State court that he has reason to, and does, believe that from prejudice or local influence he will not obtain justice in such State court, file his petition for such removal, and it was made the duty of the State court then to proceed no farther in the cause, but the cause should be removed.
This affidavit was made by Coleman and others, and also an affidavit that orders of the military authorities were involved, in May 1868. As to the validity of military orders being involved, it is perfectly manifest from all the pleadings, and from the answers of these parties, filed at the same time, that there is not the slightest foundation for removing the cause on that ground. No such questions are raised in any form whatever. This last mentioned act of congress, standing alone, might be regarded as sufficiently comprehensive to include this application. But a little consideration, I think, must show us that it was not intended by this to change the practice of the courts, and to override the decision of such courts, which had been repeatedly and uniformly made since the Judiciary Act of 1789, or to change the law of 1866, providing for such removal in a case where there could be a final determination of the controversy, so far as it concerned the applicant, without the presence of the other defendants. The act of 1866 is not repealed, nor are the provisions of this act at all repugnant to it.
The act of 1867 merely extends the privilege of removal *to the plaintiff, as well as to the defendant, on making the required affidavit.
In Fox’s adm’rs v. The Commonwealth, 16 Gratt. 1, Judge Moncure says, in deliv *219 ering the opinion of the court: ‘ ‘The law does not favor a repeal by implication unless the repugnance be quite plain, and then only to the extent of such repugnance. ’ ’ Again he says: ‘ ‘It is, therefore, an established rule of law that all acts ‘in par<a materia’ are to be taken together as if they were one law; and they are directed to be compared in the construction of statutes because they are considered as framed upon one system, and having one object in view. And the rule equally applies, though some of the statutes may have expired or are not referred to in the others.”
The provision of the act of 1866, limiting the application to a case where the party can have the suit determined, so far as it concerns him, without the presence of the other parties on the same side, is an eminently wise and just one.
It would be manifestly unjust that one defendant out of a large number, should have the right to take a case from a court where all of the other parties wish it to be, without very strong and peculiar reasons. It is very easy to see how this might often work infinite mischief and confusion; and few cases can be found which would better illustrate this than this case.
This has been seen and acted upon by all courts without exception and also by congress certainly up to the passage of this act; and with this view, and looking at the great mischief that otherwise would ensue, I cannot believe, without explicit words to that effect, that it was intended to repeal the act of 1866; and, therefore, both must be taken together in construing the real intention of congress. I do not at all call in question the constitutionality of these acts; but construe them all together, as I think we are bound to do. (See American Raw Register, January, 1870.)
*'There are other reasons why, in this particular case, the removal should not have been made.
The substantial parties in this controversy are the old company on the one side, and the new one on the other.
These are both certainly citizens of Virginia. The individuals named derive all their rights in this cause through one or the other of these companies. As individuals, they are citizens of different States; but as members of the several companies, they are not. The La Fayette In. Co. v. French and others, 18 How. U. S. R. 404. These petitioners come in simply as stockholders in the new company; and while they allege that there can be a final determination of the controversy, so far as it concerns them, without the presence of the other defendants, parties in the cause, the petition itself, as well as their answers, show that this cannot be true. The new company, of which they were stockholders, was in court defending the case, and in such case they could not, as individuals, control the cause. (See Angelí and Ames on Corporations, sec. 407, and cases there cited.) The power of stockholders to bring proceedings against the company for violation of the duty of such company is not denied; but I do not think that this was the way to come into court on such grounds. They had the power, holding, as they claim, the majority of the stock, to remove their officers and directors, if they were acting improperly, and put in their place those who would do their duty. Chap. 57, secs. 8 and 12, Code of 1860.)
These parties were allowed, at the discretion of the court, to be made defendants upon their petition representing that they had interests which would be affected. But at the same time a decree was made adjudicating the principles of the cause. True, they complained of this, but their answers did not set forth any new facts which could throw any additional light upon the principles of such adjudication; and having just come in as *defendants with others, under such circumstances, why should the decision of this question be delayed? The court says: “With a view to the speedy determination of the cause, it is deemed proper to make this adjudication.” Nor do I see that this case is one in which the parties who have not united in this last application for removal are mere formal or nominal parties, or parties without interest, in which cases the real and substantial parties have been held to have the right to remove the cause to the United States court. (See Wood v. Davis, 18 How. U. S. R. 467).
The action of the court below in making the decree adjudging the principles of the cause, at the November term 1867, has been so severly commented upon, that it seems proper to examine this action a little more critically..
The defendants, Coleman and others, then made a simple petition as stockholders of the new company, asserting that it was a legal corporation, and asking to be made parties, as they were interested in the decision of the case. They allege, it is true, they can successfully defeat the claims of the old company and establish the validity of the new company. Their petition is not sworn to, nor any new facts alleged.
The court, deeming their petition reasonable, allowed them to be made parties, and required the complainants to amend their bill so as to make them parties. It is evident, however, that the court did not intend to allow them to be made more than formal parties, and for the purpose only of establishing such equities as they might be able to show; for it seemed manifest that if the new company were adjudged void, still they, as individuals, had equitable claims upon the road. Rrom the very position they occupied and placed themselves in, they could do nothing more than this in either event. If the new company were adjudged a valid one, then this new company being properly in court, they, *as mere stockholders of that company as such, had no standing in court. But if on the other hand, the new company should be adjudged invalid, as it was, they then had nothing but equitable interests, which could *220 be preserved in no other way than as they were provided for in this very decree.
I do not see, therefore, how their rights were prejudiced. In fact, I do not see how the cause could properly proceed as to them until their precise position should be ascertained and adjudged; for as I have before said,- if they were stockholders of a valid corporation, they had no standing in court; if individuals only, they had merely equitable interests, and could not then contest the validity of the old company. The same decree that admitted them as defendants adjudged the validity of the old company. The purpose of admitting them as defendants was thus manifestly only to allow them to establish such equitable interests as they might be able to establish; and the bill was required to be amended only for that purpose, and they were allowed to file their answers only for that purpose. They complained that they were not allowed to take testimony, and that they had not then filed their answers. But they have since, and before the final decree, filed their answers, find the right to take testimony for the purpose for which it was alone proper that they should take testimony, has not been denied, but, on the contrary, is expressly provided for in the decree from which the appeal was taken.
It may be remarked that the answers filed by them do not set forth any facts additional to those which were before the court, which could have affected the decision of the question which was theq adjudicated. While, then, there seems to be an apparent inconsistency in allowing them to be made parties, and making the decree which was made before the filing of their answers and the production of their testimony, *a critical examination of the situation of the parties, and the real substance of the decree, and the intention of the court, show's, I think, that it acted with entire propriety.
The petition for removal was not made until the next term of the court, after there had been a decree in effect adjudicating the principles of the cause, and which even then might have been regarded as sufficiently final for the purposes of an appeal to an appellate court.
After their cáse is really decided, and this, too, without objection to the jurisdiction of the court, then they ask to have this cause removed, so that they can try the same question again in another forum.
To allow the removal of the cause under such circumstances would give them the chances of two courts, if the first decided against them, or, in other words, would be substantially allowing an appeal from a State to a United States court. ■
Under the act of 1867, the application must be made before final hearing. The substantial final hearing had been made, and though the parties call themselves defendants, and put in what they call answers, such answers are substantial^ nothing but petitions, or in the nature of cross-bills, setting up equitable interests, which they claim should be protected. At least, they could not be otherwise regarded by the court after the decree which it had made at a previous term, fully adjudicating the principles of the cause.
■ In view of these considerations, I am very clear that there was no error in denying the motion for removal of the cause to the Circuit court of the United States.
There is another view which may be presented, which, if correct, is conclusive, so far as this court is concerned, upon this question. The appeal to this court is not made by these petitioners. It is made by the new company. *It was not the new company which presented this last petition for removal. It did not make the motion in the court below. In fact, then, I very much doubt whether this question is properly before .us. If there was an error in refusing the petition for removal, it was an error by which the petitioners, not the company," were aggrieved. In this case, it seems to me the petitioners should have taken the appeal, in order to have the error by which they were aggrieved corrected.
I very much doubt whether one defendant can allege as ground of error that a co-defendant is aggrieved by a decision of the court below. The co-defendant should make known his complaint for himself. Ror all that the record shows, these petitioners may now acquiesce in the decision of the court below. This view may be applicable also to some of the other grievances which it is claimed these petitioners have suffered by the. final decree of the court below.
The conclusion we have come to necessarily brings us to the consideration of the next question, the validity of the sale.
The deed of trust, upon which the sale was founded, contains- this provision: “And it is mutually agreed, that in case of the death, incapacity, or resignation of the party of the second part, or of his successors in this trust, then the office of trustee filled by him shall become vacant, and such vacancy shall be filled by an appointment to be made by any court of record in the county of Alexandria, on the application of the parties of the first part, or the holders of three-fifths of said bonds: Provided, however, in the last case, notice of the application of the parties making such request be given to the president or one of the directors of said company; and all the rights, power and authority hereby conferred on the original trustee, shall then and there devolve upon and be invested in his successor or successors so appointed.
*It also provides that in case at any time six months’ interest becomes due and unpaid, the trustee “shall, upon the request in writing of the holders of at least three-fifths interest' of said bonds, ’ ’ cause the property to be sold at public auction, after giving at least sixty days’ notice of the sale by publication in certain newspapers therein named, and shall have authority thereupon to convey the said property to the purchaser.
*221 This is a contract, the authority to make which is not disputed; and upon this depends the authority of proceedings in relation to the sale, but of course is to be construed with reference to the laws of the State then in force. The manner of serving this notice must then be supposed to be according to the law relating to such service. This notice is agreed to be the process upon which the jurisdiction of a court of record to appoint a trustee depends.
But we are met at the threshold of this enquiry into the validity of the order of the court, by the proposition, that as the court was one of general jurisdiction, its judgment cannot be assailed only upon the ground of want of jurisdiction, and the presumption is, that all the steps necessary to give it jurisdiction were taken by the court. It should be borne in mind that this is not a proceeding in which this judgment is collaterally assailed, but is a bill in equity, filed for the specific purpose of setting aside this judgment and attacking it directly. The bill sets out facts for the very purpose of showing that the court did not have jurisdiction. Although the distinctions made in different cases as to when the record of a court may or may not be contradicted, are very subtle, and somewhat difficult to reconcile, I do not think that any case can be found in which it is held that such record may not be assailed in a direct proceeding for that purpose in equity, by showing *fraud, or especially by showing that the court did not in fact have jurisdiction.
However this may be, I am sure that the defendant may be allowed to show that he had no notice, and that there was no process bringing him into court, by filing a bill in equity for this specific purpose, and by actually showing such want of jurisdiction. Any other construction of law would be the most apparent injustice, for there could be no other remedy. An appeal would not correct it, for on an appeal the party would be bound by the record as it is. A judgment of a court bej'ond its jurisdiction is plainly void; and to render a judgment in personam it must have jurisdiction of the person. If it be a judgment in rem, it must have jurisdiction of the thing. Rvery lawyer knows, for example, that a judgment in a case of attachment, if there is not also a service upon the person, is only a judgment against the property. Such a judgment does not authorize a levy of an execution upon other property, nor is it even evidence of a judgment against the person. This is not a proceeding in rem. In such cases courts acquire jurisdiction only by seizure of the thing, and even then, in most, if not all cases, notice is given in some vTay to parties interested, by publication or otherwise, and especially if it is agreed that jurisdiction shall attach only by giving a notice. See Penobscot Railroad Company v. Weeks, 52 Maine R. 456; Hollingsworth v. Barbour, 4 Pet. U. S. R. 466; Harris v. Hardeman, 14 How. U. S. R. 334; Webster v. Reid, 11 How. U. S. R. 437.
In Harris v. Hardeman, the court says: “In all judgments by default, whatever may affect their competency or regularity —every proceeding, indeed, from the writ and endorsements thereon, down to the judgment itself inclusive—is part of the record, and open to examination.
Applying this principle to the present case, on the examination of the affidavit of Joseph Davison, we find *that the record itself shows that there was no notice. This would make it void upon its face. I can see no escape from this conclusion, and I do not see how it can be seriously questioned. In the case of Vorhees v. The Bank of the United States, 10 Pet. U. S. R. 449, the court say : “There is no principle of law better settled than that every proceeding of a court of competent jurisdiction shall be presumed to have been rightly done till the contrary appear.” This is a case strongly relied on by the appellants, and is perhaps one of the strongest cases on record upholding the validity of judgments of a court. But this was a case in ejectment, and a judgment of a court showing a sale by attachment was put in as defence; and in such a case the court say, though the record does not show the proper steps to have been taken, or even that the steps necessary to give jurisdiction were taken, it must be presumed that they were taken, and the facts could not be controverted in this collateral manner.
The cases of Harvey v. Tyler, 2 Wall. U. S. R. 328; Florentine v. Barton, 2 Wall. U. S. R. 210; and Comstock v. Crawford, 3 Wall. U. S. R. 304, so strongly relied upon by the appellants, were all actions of ejectment, and the records were all sought to be set aside, by showing facts aliunde; and the court held that this could not be done. The case of Devaughn v. Devaughn, supra, decided by us at the present term, was a decision upon an appeal from a judgment of the County court, in which it was claimed that the record did not show affirmatively that it had jurisdiction; and we held only that it was to be presumed that the steps necessary to give jurisdiction were taken, and that the presumption must be that the court had evidence sufficient to justify the order which was made.
But it is easy to see the difference between these cases and the one under consideration. Besides, in these cases the records did not disclose the want of jurisdiction on their face.
*But it is urged by the appellants that they had a sufficient excuse for not giving a notice, from the fact that the persons entitled to such notice had all left the country, had gone beyond the Federal lines into the lines of a public enemy; that they had abandoned the property, and were traitors to the United States government, and engaged in war upon that government, and that it was impossible to give them notice ; and the law does not require impossibilities. This presents a strong appeal to all those who were loyally disposed to the United States, especially when presented, as it is *222 in the answer, in the fiercest language and in the most glowing terms. Still, we must not be misled by such an appeal, and must subject it to the test of legal principles. These facts were certainly not shown to the County court. Nothing of them appears in the affidavits upon which the order was founded. If they could be regarded as an excuse for not bringing the person within the jurisdiction of the court, such excuse was certainly not made the basis of such jurisdiction, and it seems to me rather late to offer such excuse before ánother court to bolster up a jurisdiction which otherwise would fail. But suppose all this were true, and then shown to the court, it cannot really be seriously contended that if the parties were the greatest criminals on earth, if they had left their property without any one to attend to it, that therefore they can be deprived of their rights or their property, except by the law of the land, or, in the language of the constitution, “by due process of law.” Certainly this does not give to individual citizens the right to deprive them of such rights or property. Nor can I see how it matters whether such property were valuable or nearly worthless, or whether it had been properly or improperly managed.
But was it a sufficient excuse for not serving a notice that the persons entitled to such notice could not be found? When a condition precedent becomes impossible *of performance, a person may be excused . from performing it; but it does not therefore always follow that because it is impossible the right or privilege depending upon such condition precedent can be maintained, not even if this is made so by the acts of the other party entitled to such condition precedent.
Where a court has no jurisdiction of a person, it does not follow that because a party has done all that he could do to bring such person within such jurisdiction, and has failed, that therefore the court can proceed without obtaining jurisdiction. I cannot say, however, that in this case this impossibility was caused by the act of the party entirely. He went south, it is true voluntarily, but he went expecting to return soon; but he could not return. This was a misfortune for him; and it was also a misfortune, perhaps, for those whose rights were affected by his not being able to return, But it was a misfortune, which resulted for the most part, at least, from the war in which the nation was unfortunately engaged, and by reason of which, thousands of others, in common with the parties to this cause, unavoidably suffered, and for which courts and the usual legal proceedings could not afford an adequate remedy.
But it does not seem to me that the parties asking for the appointment of a trustee did, in fact, all that they might have done. The president of the old company still had a residence in Alexandria.
The deposition of E. S. Boynton, a witness for defendant, shows that he had residence with his family until April 1861, and he himself resided there until May, leaving his house and furniture in charge of said Boynton, and declaring that he expected to return in sixty or ninety days. We can readilj’- infer, from the facts of history within judicial cognizance, why he could not have returned if he had wished. I cannot discover from the records how there is any proper evidence of his having engaged in arms against the government, *for the answer stating such fact could not have been given upon any knowledge by the affiant, and this is not to be presumed; nor is there any sufficient evidence showing that he did not, at all times, intend to return to his place of residence. In fact, the affidavit of Davison, upon which the order of the court was made, does not state that he had no residence in Alexandria, and is defective on that ground. This, at least, should be shown positively in any aspect of the case.
I cannot see what excuse can be rendered for not serving the notice by leaving a copy at his residence as the statute prescribes.
Besides all this, the deed of trust itself shows that Benox, who was an officer and director of the company, and the trustee in the deed of trust, was a non-resident. Notice to him could certainly be given by publication in accordance with the statute. Why could not this have been done?
It was said that he received notice as trustee. But this would not prevent notice to him as director. What excuse can be offered for not notifying him by publication? This would have brought them within the provisions of the deed of trust.
If the facts, as alleged in the answer, were all true, and it appeared that the road and all the property were abandoned, and it was absolutely impossible to give any notice to anybody, and in the meantime creditors had no other means of saving their rights, while such a state of facts might be urged with great force for a court of equity to assert jurisdiction for the protection of all parties interested, upon all these facts being brought before such court, I think it very clear that a single creditor, without regard to the rights of others, without showing the court this state of facts, cannot, upon a single affidavit or petition, ask a court to make an order to protect his rights, and without really taking into its own hands the property itself for the benefit of all parties, owners as well as creditors.
*Cases have- been produced to us to show that a corporation by abandonment and nonuser of its franchises forfeits those franchises. Suppose this to be so; I cannot see how it would help these appellants. To whom would such franchise be forfeited? Evidently to the sovereignty from which they emanated. This would not allow individuals to seize upon them. They could not take advantage of such forfeiture. The new company could not derive its existence from such a source.
It is objected that the application for the order was not made by a person authorized to do so by the holders of three-fifths *223 of the bonds. I very much doubt whether the evidence fully establishes that any other than the person named, Benjamin Thornton, was the holder at the precise time.
It is very evident that Charles M. Wilkes was the holder, and entitled to hold within a very few days thereafter and sometime before the sale, whether he was the owner or not, and entitled, as such holder, to determine whether he would allow them to be converted into cash or to remain on interest at 7 per cent., or whether they should become extinguished in his hands by the conversion of the security into cash to go into the hands of a trustee not required to give security, and with whose appointment he has had nothing to do, and whom he might not be able to compel to pay to him the money to which he was entitled.
Suppose, however, that we are wrong in coming to the conclusion that this order appointing the trustee should be set aside, the admitted facts of this case show verjr plainly, I think, that the sale should be set aside on the ground of facts occurring after such order. Suppose that Stewart were the proper trustee, invested with all the power of the original trustee. He has simply a naked power to sell. His authority is based only upon the deed of trust, and he must pursue the provisions of the deed strictly. He must be able to ^'justify his act, not by any presumption or inference, but positively and necessarily. The divesting of the franchises and property of a railroad companj1" is not to be permitted upon a doubtfully exercised power of a mere naked trustee.
The first step taken is, to say the least of it, a very doubtful one. Sale can be made only on the request, in writing, of the holders of at least three-fifths of the bonds. Now the request in writing was, as specified by Davison, as agent and attorney in fact of the owners of more than three-fifth of the bonds. This is liable to two objections : first, there was no writing then produced from even the owners of the bonds. There was a writing from Davison, but this was not founded upon a writing from the owner. There is not, to this day, written evidence that the owner then, at that time, had ever authorized this demand; second, even if Davison was the agent of the owners, this does not necessarily imply that he was the agent of the holder. An owner may, and often does, divest himself for a time of the possession and right to hold his property; and for all that appears in this written notice, this may have been done.
More than this: the reasonable probability from the evidence is, that this was actually done at the time of giving this notice. While this fact may not appear to be sufficiently established to set aside an order of court it does appear sufficiently to throw great doubt upon the power of the trustee to proceed to the sale.
Certainly, at the time of the sale, Thornton was not in a position to deliver up the bonds or to require the delivery.
But let us look further at the subsequent conduct of this trustee and the circumstances of the sale.
A trustee is the agent of both parties. He is especially of the party constituting him such trustee. His duty is to be perfectly fair in all his conduct and ^especially to see that the interests of the party who has conferred upon him this power are protected to the fullest extent. His action has, 'therefore, been held to be especially the subject of enquiry bjr a court of equity; Gibson’s heirs v. Jones, 5 Leigh 370; and as such it is his duty to do all that can reasonably be done to effect the most advantageous sale possible. It has, therefore, been the common practice of our courts to require that in all such sales, if there are prior liens, either contested or doubtful, or not precisely ascertained, such liens shall be ascertained, so that they may be made known to the purchaser. Cole’s adm’r v. McRae, 6 Rand. 644; Rossett v. Fisher and others, 11 Gratt. 492; 15 Gratt. 83 and 103. Otherwise, how is it possible that there could be anything like a fair sale of the property? Now, what were the facts in this case? The affairs of the road were confessedly, and in fact charged to be by the defendants themselves in a most complicated condition. There were numerous judgments and two deeds of trust. Most of the judgments, it is true, were in fact subsequent to the deed of trust. But the fact should have been well ascertained as to which were prior and which were subsequent. There were a large number of liabilities of the company, and as the defendants themselves allege, persons owning these liabilities were making them known even at the sale. The question of the validity of the two prior deeds of trust was openly made at the sale. The trustee of the deed of trust for $60,000 was present at the sale asserting its validity, while Stewart says in his deposition, “I at the same time saw fit openly to dispute the validity of both the deeds of trust of the corporation of Washington, and Rowle, Snowden & Co. as valid liens upon the road;” and the record shows that there is at this time a contest in the courts concerning the validity of this first deed of trust.
Now, under such circumstances, was it possible that *there could be anything like a reasonable sale? How could a purchaser have any knowledge of what he was buying? The Code provides (ch. 61, sec. 29) that when a purchase is made of the works and property of a corporation, the purchaser shall not be entitled to the debts due to the first company, nor be liable for any debts of or claims against the company “which may not be expressly assumed in the contract of purchase.”
The defendants contend that by this sale a new company was formed. If this be so, ought not the contract of purchase to show whether the debts and liabilities of the old company were assumed? Ought there not to have been at the sale an understanding whether it was sold subject to the debts and *224 liabilities of the old company or not? If not then the purchaser should know it, for it would make a material difference in his bid. Certainly this ought not to be left to the mere will of the purchaser, after he has made his bid. The matter ought to have been clearly and plainly understood at the sale, and I think it would have been proper, if not necessary, that the advertisement of the sale should have stated how the sale would be made. It should, at least, have been made known generally, as well as to the purchaser, Hay, whether the sale was subject to the debts and liabilities of the old company or not.
Again, the record discloses that Stewart, who all the time .professed to act in the capacity of attorney for the purchaser, Hay, had already in his hands more than sufficient money, the property of the company, to pay all that was then due upon the bonds. This fact Hay must be presumed to have known, and to have purchased .with this knowledge. That the interest of the seller was not properly attended to is further seen by the fact that the United States government had possession of the road during all this time, and it was a well known fact that possession could not then be delivered: and no one could tell when it would be, or *what claims the government would have upon it when so delivered. It was impossible that, under such circumstances, a sale could be made otherwise than at a ruinous sacrifice.- The position of Stewart was, to say the least of it, a peculiar one. He was, if properly appointed, the trustee to make the sale, and as such, in duty bound to effect the best possible sale, and the attorney-at-law and in fact of Hay, the purchaser-, and as such interested to procure the sale on the lowest possible-terms. More than this, he had. made an agreement in writing with Davison, in which he stipulates what he will do, “on behalf of himself and constituents,” in case the road be purchased by himself or constituents; showing that he was then' contemplating a purchase by himself, as well as by his principal and client. Can he be said to have been perfectly impartial and disinterested? ,
Is it possible that a trustee for sale can at the same time be attorney at law and in fact for the purchaser, and acting in his interests?
Stewart, in fact, did immediately become interested in the purchase.
He had also previously been appointed, by writing, the attorney for Davison, the agent of the bondholders, and as such was to receive from him a large contingent fee in case of a sale of the road; he to use all diligence in the closing out and perfecting the interest of said bondholders in and to said road. (What interest had the bondholders in the road, except to receive the money which might be realized from the sale?)
On this writing there was endorsed by Joseph Thornton, May 3, 1862, “There will go to Mr. Stewart $35,000 of stock out of the $142,000 set over to me, his $35,000 being subject to a pro rata deduction in making up the $50,000, or whatever may be used of that amount, which is set apart. ’ ’ This $50,000, it otherwise appears, to be set apart for procuring a charter from congress. It is true that Stewart testifies that no agreement was effected with Davison and Thornton before the sale. But these papers appear to have been executed; and he himself testifies that the probabilities and feasibilities of forming a new company were much discussed, and, as he says, “in the event that either Thornton or Davison became the purchaser, the question of who would take an interest, and how, was much figured over as a thing entirely prospective, and it was agreed, if I saw fit to do so, I could be one of the parties forming the new company. ’ ’
These facts show, I think, that Stewart was at least so far interested in the purchase as to render it impossible for him to act as trustee with that propriety which a court of equity requires.
It further appears that no money was ever paid to the holder of the bonds from the proceeds of the sale, but they were still, by the permission of said trustee, and at the request of Joseph Thornton, allowed to remain in the bank of Riggs & Co., at Washington, as the basis of a loan to Benjamin Thornton from one Wilkes, of something over two thousand pounds, and a portion of the proceeds were used in re-organizing the new company. A company was immediately organized, of which Stewart was the secretary and a large stockholder, and stock was issued to the amount of $300,000.
This fact tends strongly to show that the object of the sale was not so much to satisfy the amount due upon the bonds, and in accordance with the real wish of the older of the bonds, as it was to get the title of the old company into the hands of these parties, who were devising a plan by means of which they could form a new company, and which had been much “figured over” by all these parties, including the trustee.
By special act of assembly, this new com- ’ pany was soon after authorized to issue stock to the amount of *$500,000, besides bonds to the amount of $200,000, and notes to the amount of $100,000.
Stock has been issued 'to a large amount in excess of the amount authorized, as the decree states, and bonds, &c., have also been issued, and out of this money has been raised and in part expended for the benefit of the road; so that it will be seen that other parties have equities in the road which should be provided for.
This history of the transactions connected with the sale must show, I think, that even if the order appointing Stewart was perfectly valid, yet the sale was conducted in such a manner, and shows such a state of actual fraud, that it cannot be sustained by a court of equity.
It is urged upon us with great earnestness and force, that even if such order were void, *225 and the sale was an illegal and fraudulent one, yet that the company, taking no steps for a period of four j'ears, and allowing the stockholders of the new company to invest large sums of money on the faith of the validity of such sale, without being cognizant of such fraud, the old company should be considered as having acquiesced in such sale, and should now be estopped from contesting such validitjr as against them.
There are cases which show that acquiescence in sales made by order of a court of competent jurisdiction for a long period, shall be regarded as a waiver of the right to contest the validity of such sales. In extreme cases, where there has been long acquiescence, sales made by order of the court have been sustained on the ground that judicial sales ought to receive the highest possible sanction, and should be regarded as giving the utmost possible protection to the purchaser.
But, in the first place, the acquiescence which is shown in this case is not of such a character as I think should be regarded as an estoppel.
The parties who alone could object for the old company *were in such a situation that, so far as they were concerned, it was for nearly the whole period a forced acquiescence. True, they had gone into the lines of public enemies against the United States, and had gone voluntarily; but whatever may be said of the wrongful nature of said acts, yet they were in such a situation that it cannot be said that, during this period, they voluntarily acquiesced in the disposition of their property. Besides, up to August 1865, the government was in actual and exclusive possession and control of all this property; and while it was so, I do not think any party could be justified in claiming to act in entire ignorance of all claims that might be brought against it. I cannot give any countenance to the claim that the government held, as a tenant of Hay under a contract made by him, as a mere creditor and with no claim upon the road, except such as might have been satisfied by the payment of $5,000.
Again, so far as the sale was concerned, It was not a judicial one. The court had nothing whatever to do with the sale. The court simply substituted one trustee in the place of another. The court did not direct the sale. The sale was not professed tb have been made by any other authority than that of a trustee, with no power to guarantee the title, who did not profess to guarantee the title, and the purchaser was bound to make enquiry and to fully investigate the sources of his authority, and if he neglected to do so, it was his own negligence. And such a sale is not at all like one where a purchaser has an order of a court of competent jurisdiction, and which he is authorized to presume to be correct.
Again, a corporation cannot be created by mere acquiescence. This can be done only by positive act of legislation, or bjr some power authorized by some legislative act.
Still, under the circumstances of this case, the new company ought to have reimbursed to it the money '*which it has actually expended for the benefit of the road, which ought to go to its stockholders.
A very large portion of the money invested by the stockholders seems to have been upon representations for which the old company could be in no wise responsible, and it certainly could not be regarded as having acquiesced in them. Much of it has been upon false and spurious certificates of stock, issued by the new company; but the remedy of those who have thus been deceived is upon those whom they have trusted. Their case is an extremely hard one, and appeals strongly to our sympathies, and so far as they can be lawfully protected they should be.
They claim that a very large amount (several hundred thousand dollars) has been expended for the benefit of the road, and provision should be made for the repayment of so much of this as they can establish; and this can be done under the decree as it now stands, and such further orders as may be made by the court upon a consideration of the evidence which may be produced.
The new company procured a special act to be passed by the Alexandria legislature, February 5th, 1863, declaring this sale to be a valid one.
This act was in plain violation of the constitution, and therefore void.
It was an assumption of judicial power by the legislature.
Art. II, constitution of Virginia, declared “the legislative, executive and judicial departments shall be separate and distinct, so that neither shall execute the powers properly belonging to either of the others.
Art. IV, section 35, provides that the general assembly shall not, bjr special legislation, grant relief in a case of which the courts or other tribunals may have jurisdiction.
Besides, it attempts to divest antecedently vested rights, and also to impair the obligation of the contracts *between the parties. (See Taylor v. Stearns & als., 18 Gratt. 244, 274.)
I can see no necessity for giving a construction to the statute relating to the sale of the works and property of a corporation, and the powers and privileges of the purchaser at such sale. (Sections 28 and 29, ch. 61 of Code of 1860.) This is a matter rather for the new company and those connected therewith to settle among themselves, and suits are now pending, as I am informed, to determine the questions between them.
The decree of the court below very properly provides for an investigation into the equitable interests of the several parties to this controversy, and for security for their protection, and I see no reason why it should not be fully affirmed.